UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. JENNIFER CHOE-GROVES, JUDGE

_____

| | |
|---|---|
| BRAL CORPORATION, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| UNITED STATES, | : |
| | : |
| Defendant. | : |

Court No.  20-00154

_____ :

## <u>ORDER</u>

Upon consideration of defendant's cross-motion for summary judgment and response in

opposition to plaintiff's motion for summary judgment, other papers on file, and upon due

deliberation, it is hereby

**ORDERED** that defendant's cross-motion for summary judgment is hereby granted; and

it is

**ORDERED** that plaintiff's motion for summary judgment is hereby denied; and it is

further

**ORDERED** that judgment is entered for defendant and this action is dismissed.

_____
JUDGE

Dated: _____
New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. JENNIFER CHOE-GROVES, JUDGE

_____
                                                         :
BRAL CORPORATION,                                        :
                                                         :
                                 Plaintiff,              :        Court No.  20-00154
                                                         :
                          v.                             :
                                                         :
UNITED STATES,                                           :
                                                         :
                                 Defendant.              :
_____              :

### DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Rules of the United States Court of International Trade, defendant, United States, respectfully moves for an order granting defendant's cross-motion for summary judgment, denying plaintiff's motion for summary judgment, and dismissing this action.  The reasons for our cross-motion are set forth in the accompanying memorandum, defendant's response to plaintiff's Rule 56.3 statement of material facts not in dispute, and defendant's Rule 56.3 statement of undisputed materials facts.

WHEREFORE, defendant respectfully requests that an order be entered granting defendant's cross-motion for summary judgment, denying plaintiff's motion for summary judgment, entering judgment for defendant, dismissing this action, and granting defendant such other and further relief as may be just and appropriate.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

By:     JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

/s/ Aimee Lee
AIMEE LEE
Assistant Director

Of Counsel:

Sabahat Chaudhary
Office of the Assistant Chief Counsel
International Trade Litigation
U.S. Customs and Border Protection

/s/ Alexander Vanderweide
ALEXANDER VANDERWEIDE
Senior Trial Counsel
Civil Division, U.S. Dept. of Justice
Commercial Litigation Branch
26 Federal Plaza
New York, New York 10278
Tel. (212) 264-9230 or 0482
Attorneys for Defendant

Dated: July 18, 2022

2

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. JENNIFER CHOE-GROVES, JUDGE

_____
                                      :

BRAL CORPORATION,                :
                                        :

                    Plaintiff,     :         Court No.  20-00154
                                        :

         v.                      :
                                        :

UNITED STATES,                  :
                                        :

                    Defendant.    :
_____ :

### DEFENDANT'S RESPONSE TO PLAINTIFF'S
### RULE 56.3 STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

      Pursuant to Rule 56 of the Rules of the United States Court of International Trade,

defendant, United States, responds to plaintiff's, Bral Corporation (Bral), Rule 56.3 statement of

material facts not in dispute as follows:

      1.      Admits.

      2.      Defendant can neither admit nor deny whether the "face and back surfaces of the

plywood were coated with melamine" insofar as plaintiff has presented conflicting evidence

regarding how the melamine is applied to the plywood, and whether the melamine was applied to

the back surface of the plywood.  *See* Def's Ex. A, Deposition Transcript of Keith Dunbar (KD

Depo) at 21; Def's Ex. C, Deposition Transcript of Mark Schroeder (MS Depo) at 13.  Avers that

the melamine was applied by an exterior glue to the face of the plywood.  *See* KD Depo at 20-21;

MS Depo at 12-13.  Otherwise, admits.

      3.      Admits.

      4.      Admits.

      5.      Admits, but denies any inference that Transglobal Door, Inc. (Transglobal) only

"planned" to use the plywood to manufacture roll-up doors and panels for the aftermarket.  Avers that Transglobal used the plywood to manufacture roll-up doors and panels for the aftermarket. *See* KD Depo at 18; MS Depo at 16-17, 38-39; Pl's Ex. Q, Item Stock Inquiry Reports (ISIR).

6.      Denies.  Avers that the plywood was developed by Bral and Transglobal beginning in approximately 2015.  *See* KD Depo at 19.  Further avers that plaintiff has not produced "specifications" for the imported plywood.  *See, e.g.,* MS Depo at 83, 158; KD Depo at 68; Def's Ex. E, Pl's Documents Produced (Pl. Docs) at Bates 0122.

7.      Denies.  Avers that development of the plywood involved testing for a period of six months, but defendant can neither admit nor deny whether the testing was "significant," as it is unclear what "significant" means in this context.  *See* MS Depo at 17, 127.  Further avers that plaintiff has not produced "specifications" for the imported plywood.  *See, e.g.,* MS Depo at 83, 158; KD Depo at 68; Pl. Docs at Bates 0122.

8.      Denies that the plywood was manufactured to the specifications established by Bral and Transglobal, as plaintiff has not produced "specifications" for the imported merchandise.  *See, e.g.,* MS Depo at 83, 158; KD Depo at 68; Pl. Docs at Bates 0122.  Otherwise, admits.

9.      Denies.  Avers that for the six-month period beginning with plywood that Transglobal received on July 25, 2016, Transglobal gave away completed doors made with the plywood to a local Red Cross and school to test the doors in the field.  *See* MS Depo at 17-18.

10.      Admits that the purpose of the installations referenced in ¶9 was to test the doors in the field, but denies any inference that the doors were tested under all actual environmental conditions in the field.  Avers that this field testing did not include exposing the doors to winter

freeze and subsequent spring thaw.  *See* MS Depo at 20-21, 78; Def's Ex. D, Deposition

Transcript of James Schroeder (JS Depo) at 20, 28.

11.    Admits.

12.    Defendant can neither admit nor deny whether the "plywood performed well in

these tests" as it is unclear what "performed well" means in this context.  Otherwise, admits.

13.    Denies.  Avers that plaintiff has not established Bral's and Transglobal's

expectations regarding the manufacture of the plywood, nor has plaintiff produced

"specifications" for the imported plywood.  *See, e.g.,* MS Depo at 83, 158; KD Depo at 68; Pl.

Docs at Bates 0122.

14.    Admits.

15.    Defendant can neither admit nor deny whether the failures reported by

Transglobal's customers were "catastrophic" as it is unclear what "catastrophic" means in this

context.  Otherwise, admits.

16.    Denies that the statement "which exposed the underlying plywood to the elements

leading to the delamination of the plywood layers" is supported by the citation provided.

Defendant can neither admit nor deny whether the failures were "catastrophic" as it is unclear

what "catastrophic" means in this context.  Otherwise, admits.

17.    Denies.  Avers that Transglobal continued to manufacture and sell replacement

doors and panels from the imported plywood until July, August, or October 2018, and may have

done so as late as January 2019.  *See* MS Depo at 64; JS Depo at 29-31; ISIR.  Further avers that

after the last entry at issue in this litigation was received in June 2018, plaintiff ceased to import

plywood from China.  *See* KD Depo at 29; ISIR; ECF No. 6, Protests and Entries.

18.    Admits that the referenced "Letter of Statement" from Linyi Feixian Plywood Factory states that the "plywood delamination issue since the last two years" was purportedly a result of the "glue supplier lowed [sic] the glue quality due to cost increasing issue," but denies that plaintiff has established that the contents of the referenced letter are accurate and is confirmation that a lower quality glue had in fact been used to attach the melamine to the plywood. *See* Pl. Ex. L, Pl. Docs at Bates 0067. Avers that plaintiff and Transglobal do not know when the referenced letter was created and received, and what specific two-year period is being referred to in the letter. *See* KD Depo at 65-67; MS Depo at 145-47. Further avers that it is unknown if the plywood manufacturer switched glue suppliers during the two-year period, authorized the glue change to the plywood, was itself aware of the glue change at the time it was changed, or even why the glue change caused the delamination issues. *See* KD Depo at 27, 65-67. Also avers that Bral and Transglobal suspect that the plywood manufacturer changed the glue on its own accord, likely to meet the low-costs that Bral sought for the imported plywood, while pointing the finger at the unknown glue supplier. *See* Def's Ex. B, Deposition Transcript of Alison Dunbar (AD Depo) at 27-28; MS Depo at 65, 117-18, 145-48; JS Depo at 40-41.

19.    Admits that this is a statement of plaintiff's claim, but denies that plaintiff has substantiated the claim with documentation. Avers that Mark Schroeder, President of Transglobal, testified that any unused imported plywood in Transglobal's stock cannot be fixed for future use in the manufacture of doors and panels. *See* MS Depo at 84-85. Further avers, that at the direction of plaintiff's counsel, on account of this litigation, neither Bral nor Transglobal has attempted to resell any of the unused imported plywood. *See* AD Depo at 26-27; MS Depo at 86-87, 158-60.

4

20.     Admits that this is a statement of plaintiff's claim, but denies that plaintiff has substantiated the claim with documentation.  Avers that Mark Schroeder testified that any unused imported plywood could be repurposed as skids and crates.  *See* MS Depo at 85-86.

21.     Admits that this is a statement of plaintiff's claim, but denies that Transglobal has "determined" the value of the unused imported plywood, and that plaintiff has substantiated the claim with documentation.  *See* Def's Ex. F, Pl.'s Responses to Def's 1st Request for Production and Things (RFP Responses) at Nos. 11 and 18.  Avers that plaintiff's 18 percent claimed salvage value was determined by Mark Schroeder as the lowest wholesale amount that it would cost Transglobal to purchase non-marine grade lumber from its local supplier for making crates and skids.  *See* AD Depo at 11, 29-30; MS Depo at 158-60; Compl. ¶13.  Further avers that the 18 percent alleged salvage value is solely the result of Mark Schroeder's phone calls with Transglobal's local lumberyard.  *See* MS Depo at 167-69; AD Depo at 30-33.  Also avers that Mark Schroeder testified that the current wholesale or retail salvage value of the imported plywood would likely be 25-40 percent of the original invoiced value of the plywood, and not 18 percent.  *See* MS Depo at 166-67.

22.     Admits.

23.     Admits.

24.     Admits that plaintiff provided affidavits from Alison Dunbar and Mark Schroeder with its protests to support its claims, but denies that the affidavits evidenced support of its claims.

25.     Admits.

26.     Admits that the inventory records show the quantity of imported plywood remaining in Transglobal's inventory, but denies that plaintiff has established when production was halted.  Avers that Transglobal continued to manufacture and sell replacement doors and panels from the imported plywood until July, August, or October 2018, and may have done so as late as January 2019.  *See* MS Depo at 64; JS Depo at 29-31; ISIR.

27.     Admits.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

By:     JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

/s/ Aimee Lee
AIMEE LEE
Assistant Director

Of Counsel:

/s/ Alexander Vanderweide
Sabahat Chaudhary                       ALEXANDER VANDERWEIDE
Office of the Assistant Chief Counsel   Senior Trial Counsel
International Trade Litigation           Civil Division, U.S. Dept. of Justice
U.S. Customs and Border Protection      Commercial Litigation Branch
                                        26 Federal Plaza
                                        New York, New York 10278
                                        Tel. (212) 264-9230 or 0482
                                        Attorneys for Defendant

Dated: July 18, 2022

6

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. JENNIFER CHOE-GROVES, JUDGE

_____
                                              :
BRAL CORPORATION,                             :
                                              :
                         Plaintiff,           :        Court No.  20-00154
                                              :
              v.                              :
                                              :
UNITED STATES,                                :
                                              :
                         Defendant.           :
_____  :

### **DEFENDANT'S RULE 56.3 STATEMENT OF UNDISPUTED MATERIAL FACTS**

Rule 56.3 of the Rules of the United States Court of International Trade (USCIT) requires that motions for summary judgment include a separate statement of material facts as to which it is contended there exists no genuine issue to be tried.

Defendant, United States, identifies the following statements of material facts in support of its cross-motion for summary judgment as to which there are no genuine issues to be tried:

1.      The imported plywood in the entries at issue (hereinafter, imported plywood) consists of seven-ply eucalyptus, with interior glue applied by pressure and heat between the layers of the plywood, a hardwood face, and melamine (a composite plastic/resin laminate) applied by an exterior glue to the face of the plywood.  *See* Def's Ex. A, Deposition Transcript of Keith Dunbar (KD Depo) at 20; Def's Ex. C, Deposition Transcript of Mark Schroeder (MS Depo) at 12.

2.      QF, an abbreviation used by plaintiff, Bral Corporation (Bral), for a factory in Linyi, China, makes the initial plywood, laminates it, puts the hardwood face on, and sands the plywood to the correct dimensions.  *See* KD Depo at 12, 21, 65-67; MS Depo at 15, 145-47.  QF

then sends the plywood to an unknown Chinese subcontractor for laminating and gluing the melamine to the face of the plywood. *See* KD Depo at 20-21.

3.　　An unknown Chinese specialty plywood-maker supplied QF with the exterior glue for the imported plywood's melamine face as a favor to QF, but it is unknown to Bral, QF, and Transglobal Door, Inc. (Transglobal), the ultimate purchaser of the imported plywood, the specific glue that was supplied or used for the imported plywood. *See* KD Depo at 15-17, 23; Def's Ex. B, Deposition Transcript of Alison Dunbar (AD Depo) at 23, 28; MS Depo at 13; Def's Ex. D, Deposition Transcript of James Schroeder (JS Depo) at 19, 33-35, 40-41.

4.　　Bral and Transglobal expected that the exterior glue for the imported plywood would be a waterproof phenolic resin. *See* KD Depo at 23; MS Depo at 65-66; JS Depo at 13-14, 33-35.

5.　　Bral did not specifically request to QF that the imported plywood contain phenolic glue, or enter into a written contract with QF or the unknown Chinese glue supplier for the specific glue to be used, or memorialize that the type of glue was not to be changed during production of the plywood. *See* KD Depo at 25-26.

6.　　The plywood imported by Bral was sold to Transglobal to be manufactured into roll-up doors and panels in the aftermarket, *i.e.*, as replacement doors and panels on older delivery trucks. *See* KD Depo at 18; MS Depo at 17.

7.　　The imported plywood was not suitable for use by Transglobal to manufacture OEM (Original Equipment Manufacturer) doors for new trucks because the OEM doors made by Transglobal are of a composite steel material or a higher face-quality transportation grade plywood. *See* MS Depo at 38-39, 162; JS Depo at 12-13.

8.      The imported plywood consists of three sizes: 1220 mm x 2489 mm x 19 mm

(48" x 98" x ¾" in inches) (hereafter, 48" sheets), 388 mm x 2489 mm x 19 mm (15" x 98" x

¾") (hereafter, 15" panels), and 286 mm x 2489 mm x 19 mm (11" x 98" x ¾") (hereafter 11"

panels).  *See* ECF No. 6, Protests and Entries; MS Depo at 44-45.  48" sheets are the standard

plywood size for the roll-up door industry, and 11" and 15" panels are used for panel

replacements or can be combined to make a full door.  *See* MS Depo at 44-45, 161, 165.

9.      For reasons unknown to both Bral and Transglobal, the imported plywood is

described on the commercial invoices as "fancy plywood," a designation not used in the plywood

industry.  *See* Protests and Entries; KD Depo at 34-35; MS Depo at 80-81.

10.     There are no purchase orders for the imported plywood; nor are there documents,

emails, or other communications issued by Bral to QF for the specific quantity and sizes of

imported "fancy plywood" listed on the invoices for the entries at issue, or that clearly describe

and document the components and requirements of the "fancy plywood" that Bral ordered.  *See*

AD Depo at 25-26; MS Depo at 157; Def's Ex. I, Post-Deposition Request Responses from

Plaintiff's Counsel (Post-Depo Responses).

11.     There are no specifications, schematics, diagrams, process memoranda, or bills of

materials for the imported "fancy plywood" that specify that it "must withstand exposure to salt

spray, rain and ultra-violet light."  *See* MS Depo at 83, 158; KD Depo at 68; Def's Ex. E, Pl's

Documents Produced (Pl. Docs) at Bates 0122; Compl. ¶10.

12.     Development of the Chinese-made plywood began approximately in 2015 for cost

savings reasons, as a cheaper replacement for the domestic plywood Transglobal used to

manufacture replacement doors and panels.  *See* KD Depo at 18-19; MS Depo at 41.

3

13.     The imported plywood was 25 percent less expensive (or cheaper by $12 a sheet) than the plywood sourced domestically for Transglobal to manufacture replacement doors and panels; the domestic plywood is seven-ply ¾" marine-grade Douglas Fir plywood with a painted hardwood face and no melamine, and very rarely had delamination issues.  *See* KD Depo at 45; MS Depo at 10-11, 30-32, 42.

14.     During the development of the Chinese-made plywood, a variety of plywood samples consisting of various components and woods, including eucalyptus, poplar, birch, and pine, were manufactured by QF and imported by Bral to be tested.  *See* KD Depo at 22-23, 46-47; MS Depo at 65-67, 124-27; JS Depo at 12-13.  These tests involved subjecting the plywood samples to hundreds of hours in a salt-spray cabinet, hanging the samples outside for months, and manufacturing the plywood samples into roll-up doors and installing them in local trucks to see how they performed—but the identity or nature of the specific glue was not specifically tested.  *See* KD Depo at 26, 33; MS Depo at 17-18, 101-02, 117, 127-28; JS Depo at 25-26, 28-29.

15.     By the end of 2016, Transglobal and Bral had a plywood product ready to import from QF, although Keith Dunbar, founder of Bral and its President and also a Vice-President of Transglobal, does not recall what wood—and why—was settled-on for the imported plywood.  *See* KD Depo at 6-9, 22-23, 46; MS Depo at 129; Def's Ex. G, Pl.'s Responses to Def's First Set of Interrogatories (Rog Responses) at No. 1.

16.     Bral and Transglobal continued to import and test samples of Chinese-made plywood of various components (*i.e.*, woods, glues, faces, etc.) after Bral began importing the

eucalyptus-based plywood at issue in this litigation in order to import the cheapest plywood product possible.  *See* MS Depo at 132-34; Pl. Docs at Bates 0028, 0091.

17.     The imported plywood consists of eucalyptus, a high water-absorption wood that QF must first dry to lower its moisture content, does not perform as well as the domestically-sourced Douglas Fir wood, and "is a very difficult wood to [get] good glue adhesion."  *See* MS Depo at 103-04, 108-09; Pl. Docs at Bates 0135, 0162-63, 0183.

18.     Once the containers of imported plywood arrive in Cleveland, Bral neither opens nor inspects the containers; instead, Bral forwards the containers directly to Transglobal.  *See* AD Depo at 18.  When Transglobal receives the imported plywood, it inspects the plywood for the correct thickness, cuts it to size, and manufactures the plywood into a replacement panel or door.  *See* MS Depo at 24.  Upon receipt of the imported plywood, Transglobal does not test samples of the imported plywood from the entries at issue in the salt-spray cabinet, nor does it test the glue from the imported plywood.  *See* MS Depo at 76-77, 80, 117; JS Depo at 29.

19.     When manufacturing replacement doors, Transglobal drills the laminate face of the imported plywood and rivets the door's hardware.  *See* MS Depo at 33-35.  After Transglobal manufacturers a door, the door is measured and inspected for surface defects, boxed, and shipped out to the customer within five days of being made.  *See* MS Depo at 46.  The customers then install the doors or panels themselves when an existing door or panel needs replacing.  *See* MS Depo at 38-39, 71-72, 75.

20.     Transglobal offers a one-year warranty for any delamination issues on its replacement doors and panels made with the imported plywood, running from the date of installation.  *See* MS Depo at 37, 87-88.

21.     Transglobal did not sell replacement doors or panels made with plywood imported from China until January 2017.  *See* MS Depo at 17.

22.     According to Transglobal, problems with the plywood imported from China began with shipments it received in May or July 2017; this plywood would have been made-up into doors or panels and sold two to six months later, with Transglobal's customers purchasing the doors in October or November 2017 and complaining in Spring 2018 that the melamine faces were falling off the doors.  *See* MS Depo at 19-21, 58, 61, 73; JS Depo at 20.

23.     Transglobal received warranty claims for 161 delaminated doors and 171 delaminated panels (332 in total) between May 9, 2017 and February 3, 2021.  *See* Def's Ex. H, Warranty Claims For Delaminated Wood (Warranty Claims).  In total, 1298 11" and 15" panels and 432 and two-thirds (432.67) 48" sheets were used in the manufacture of the 161 delaminated doors and 171 delaminated panels.  *Id*.

24.     Transglobal was unaware of any issues with the imported plywood used in its manufactured doors and panels until approximately March or April 2018.  *See* MS Depo at 21, 61; JS Depo at 20.

25.     Transglobal continued to manufacture and sell replacement doors and panels from the imported plywood until July, August, or October 2018, and may have done so as late as January 2019.  *See* MS Depo at 64; JS Depo at 29-31; Pl's Ex. Q, Item Stock Inquiry Reports (ISIR).

26.     Bral and Transglobal posit that the claimed delamination issues—in which the melamine faces on installed replacement doors and panels made from the imported plywood came apart after being subject to moisture and freeze throughout the winter and then thaw and

drying out in the spring sun—was caused by the unknown Chinese glue supplier switching the plywood's exterior glue (of unknown type) to a lower quality glue (also unknown).  *See* KD Depo at 25, 29-30, 42; MS Depo at 67, 78, 117; JS Depo at 20, 28-29, 40-41.  However, Bral and Transglobal suspect that QF changed the glue on its own accord, likely to meet the low-costs that plaintiff sought for the imported plywood, while pointing the finger at the unknown glue supplier.  *See* AD Depo at 27; MS Depo at 65, 117-18, 145-48; JS Depo at 40-41.

27.     An undated "Letter of Statement" from Linyi Feixian Plywood Factory to Transglobal states that the "plywood delamination issue since the last two years" was purportedly a result of the "glue supplier lowed [sic] the glue quality due to cost increasing issue."  *See* Pl. Ex. L, Pl. Docs at Bates 0067.  Bral and Transglobal do not know when this letter was created and received, and what specific two-year period is being referred to in the letter.  *See* KD Depo at 65-67; MS Depo at 145-47.  It is also unknown if QF switched glue suppliers during the two-year period, authorized the glue change to the plywood, was itself aware of the glue change at the time it was changed, or even why the glue change caused the delamination issues.  *See* KD Depo at 27, 65-67.

28.     After the last entry at issue in this litigation was received by Transglobal in June 2018, Bral ceased to import plywood from China; now Bral and Transglobal once again source all plywood domestically.  *See* KD Depo at 29; ISIR; Protests and Entries.

29.     Although QF indicated that it could replace the plywood—and it is customary in the industry for manufacturers to replace delaminated plywood—neither Bral nor Transglobal requested it to do so.  *See* AD Depo at 27; JS Depo at 21-22, 24, 32; Pl. Docs at Bates 0050-51.

30.     Bral and Transglobal did not recover any costs from QF or the glue supplier, and Bral and Transglobal decided not to sue either entity as they believed they would be unable to recover from Chinese companies.  *See* KD Depo at 31-32, 67; AD Depo at 28-29; MS Depo at 70, 148; JS Depo at 21-22.

31.     The imported plywood was not insured, and Transglobal did not make a claim to its product liability insurer for any defective doors that it manufactured with the imported plywood as it was unclear to Transglobal whether such a claim would be covered and its impact on Transglobal's premiums.  *See* MS Depo at 70, 90.

32.     Of the 7,889 48" sheets, 30,238 15" panels, and 5,616 11" panels received by Transglobal from the twelve entries at issue, in total, 5,900.86 48" sheets, 10,334.44 15" panels, and 680.30 11" panels were used to manufacture doors and panels.  *See* ISIR.

33.     Transglobal received shipments of plywood imported from China on 05/03/2017, 06/26/2017, 08/07/2017, 08/31/2017, and 09/20/2017, which in total, consisted of 4823 48" sheets and 7214 15" panels.  *See* ISIR.

34.     Bral's claimed 18 percent salvage value number was determined by Mark Schroeder, President of Transglobal, as the lowest wholesale amount that it would cost Transglobal to purchase non-marine grade lumber from its local supplier for making crates and skids.  *See* AD Depo at 11, 29-30; MS Depo at 158-60; Compl. ¶13.  The claimed 18 percent alleged salvage value figure is solely the result of Mr. Schroeder's phone calls with Transglobal's local lumberyard.  *See* MS Depo at 167-69; AD Depo at 30-33.  However, "{t}here are no documents, including proofs of sale, to substantiate the 18% salvage value."

Def's Ex. F, Pl.'s Responses to Def's 1st Request for Production and Things (RFP Responses) at No. 11; *see also* RFP Responses at No. 18.

35.     Today, Mark Schroeder believes that the wholesale or retail salvage value of the imported plywood would likely be 25-40 percent of the original invoiced value of the plywood, and not 18 percent.  *See* MS Depo at 166-67.

36.     At the direction of plaintiff's counsel, on account of this litigation, neither Bral nor Transglobal attempted to resell any of the unused imported plywood.  *See* AD Depo at 26-27; MS Depo at 84-87, 158-60.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

By:     JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

/s/ Aimee Lee
AIMEE LEE
Assistant Director

Of Counsel:

/s/ Alexander Vanderweide
ALEXANDER VANDERWEIDE

Sabahat Chaudhary                           Senior Trial Counsel
Office of the Assistant Chief Counsel       Civil Division, U.S. Dept. of Justice
International Trade Litigation               Commercial Litigation Branch
U.S. Customs and Border Protection          26 Federal Plaza
                                            New York, New York 10278
                                            Tel. (212) 264-9230 or 0482
Dated: July 18, 2022                        Attorneys for Defendant

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. JENNIFER CHOE-GROVES, JUDGE

_____
                               :

BRAL CORPORATION,                :
                               :

               Plaintiff,     :         Court No.  20-00154
                               :

               v.               :
                               :

UNITED STATES,                 :
                               :

               Defendant.   :
_____ :

## <u>DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>

                                BRIAN M. BOYNTON
                                Principal Deputy Assistant Attorney General

                                PATRICIA M. McCARTHY
                                Director

                                JUSTIN R. MILLER
                                Attorney-In-Charge
                                International Trade Field Office

                                AIMEE LEE
                                Assistant Director

Of Counsel:
Sabahat Chaudhary                   ALEXANDER VANDERWEIDE
Office of the Assistant Chief Counsel     Senior Trial Counsel
International Trade Litigation             Civil Division, U.S. Dept. of Justice
U.S. Customs and Border Protection     Commercial Litigation Branch
                                26 Federal Plaza
                                  New York, New York 10278
                                Tel. (212) 264-9230 or 0482
                                Attorneys for Defendant

Dated: July 18, 2022

# TABLE OF CONTENTS

PROCEDURAL BACKGROUND ................................................................................ 1

PARTIES ................................................................................................................... 3

IMPORTED MERCHANDISE ................................................................................... 4

QUESTION PRESENTED ........................................................................................ 10

SUMMARY OF ARGUMENT ................................................................................. 10

ARGUMENT ............................................................................................................ 11

  I.    STANDARD OF REVIEW ............................................................................ 11

  II.   BRAL'S IMPORTED PLYWOOD IS NOT ENTITLED
        TO AN ALLOWANCE REDUCING ITS VALUE ....................................... 12

    A.  Bral Has Not Shown That It Contracted For Defect-Free Merchandise ........................ 13

    B.  Bral Cannot Show That The Imported Plywood Was
        Defective At The Time Of Importation And Link
        Any Purported Defects To Specific Entries ........................................ 17

    C.  Bral Cannot Establish That Its Imported Plywood Should
        Be Reduced To 18 Percent Of Its Liquidated Value ........................ 23

CONCLUSION ......................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ............................................................................................... 11

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) ............................................................................................... 11

*Fabil Mfg. Co. v. United States,*
237 F.3d 1335 (Fed. Cir. 2001) .................................................................... 13, 14, 18

*Matsushita Elecs. Indus. Co. v. Zenith Radio Corp.,*
475 U.S. 574 (1986) ............................................................................................... 12

*Phone-Mate, Inc. v. United States,*
690 F. Supp. 1048 (Ct. Int'l Tr. 1988)
*aff'd* 867 F.2d 1404 (Fed. Cir. 1989) ........................................................................ 12

*Saab Cars USA, Inc. v. United States,*
434 F.3d 1359 (Fed. Cir. 2006)........................................................................... 13, 17

*Samsung Elecs. Am. v. United States,*
106 F.3d 376 (Fed. Cir. 1997)...................................................................................... 13

*Samsung Elecs. Am. v. United States,*
195 F.3d 1367 (Fed. Cir. 1999)........................................................... 13, 18, 23, 24

*Texas Apparel Co. v. United States*,
698 F. Supp. 932 (Ct. Int'l Tr. 1988)
*aff'd* 883 F.2d 66 (Fed. Cir. 1989)
*cert denied* 493 U.S. 1024 (1990)............................................................................. 11

*United States v. Pan Pac. Textile Group Inc.,*
276 F. Supp. 2d 1316 (Ct. Int'l Tr. 2003).............................................................. 12

*Volkswagen of Am., Inc. v. United States,*
540 F.3d 1324 (Fed. Cir. 2008)........................................................................... 12, 17

**Harmonized Tariff Schedule of the United States**

Chapter 44

   Heading 4412

      Subheading 4412.32.57............................................................................. 2

**Statutes**

19 U.S.C. § 1401a(a)(1)(A) .................................................................................. 2, 12

19 U.S.C. § 1401a(b) ................................................................................................ 12

19 U.S.C. § 1401a(b)(1)........................................................................................... 12

**Rules**

USCIT Rule 30(b)(6) .................................................................................................. 4

USCIT Rule 56 ........................................................................................................... 11

USCIT Rule 56(c)...................................................................................................... 11

**Regulations**

19 C.F.R. § 158.12(a)...................................................................................................*passim*

**Other Authorities**

*Certain Hardwood Plywood Products from the People's Republic of China:Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order*, 83 Fed. Reg. 504 (January 4, 2018)...........................................................................2

*Certain Hardwood Plywood Products from the People's Republic of China:Countervailing Duty Order*, 83 Fed. Reg. 513 (January 4, 2018)...........................................................................2

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. JENNIFER CHOE-GROVES, JUDGE

_____
                                        :
BRAL CORPORATION,                       :
                                        :
                    Plaintiff,          :        Court No.  20-00154
                                        :
          v.                            :
                                        :
UNITED STATES,                          :
                                        :
                    Defendant.          :
_____  :

## DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Rules of the United States Court of International Trade (USCIT), defendant, United States (the Government), hereby submits this memorandum in support of its cross-motion for summary judgment and response in opposition to plaintiff's, Bral Corporation (Bral), motion for summary judgment.  Bral has not demonstrated that the imported merchandise was partially damaged at the time of importation.  Nor has Bral satisfied the requirements for an allowance in value pursuant to 19 C.F.R. § 158.12(a).  As such, U.S. Customs and Border Protection (CBP) correctly appraised the merchandise at liquidation without an allowance in value.  Therefore, we respectfully request that judgment be entered in our favor and that this action be dismissed.

## PROCEDURAL BACKGROUND

This matter concerns eleven entries, made at the Port of Cleveland between August 16, 2017 and June 14, 2018, of plywood imported from the People's Republic of China (hereinafter,

imported plywood).[1]  *See* ECF No. 6, Protests and Entries.  CBP classified the imported plywood under Harmonized Tariff Schedule of the United States (HTSUS) subheading 4412.32.57, and appraised the plywood under transaction value, pursuant to 19 U.S.C. §§ 1401a(a)(1)(A) and 1401a(b), based on the invoice amount included with each entry.  *Id*.  In doing so, upon liquidation, CBP assessed each entry an 8% *ad valorem* duty, a merchandise processing fee, a harbor maintenance fee, and *ad valorem* antidumping (AD) and, where applicable, countervailing duties (CVD) pursuant to AD/CVD Orders A-570-051 and C-570-052.[2]

Bral filed Protest No. 4101-19-100494 against the liquidations of three of its entries on October 25, 2019, and Protest No. 4101-19-100808 against the liquidations of nine of its entries on December 23, 2019, all of which challenged the liquidated value of the entries.  *See* Protests and Entries.  Specifically, in its protests, Bral claimed that the "¾" melamine coated marine grade eucalyptus plywood from China" was latently defective, and as such, submitted a revised invoice for each protested entry in accordance with 19 C.F.R. § 158.12(a), adjusting the prices for the imported plywood to 18 percent of the original invoiced amounts.  *Id*.  In addition to the revised invoices, Bral included with its protests an explanatory statement, photos of the purported defect, an affidavit from a representative from Bral, dated May 13, 2019, and an affidavit from a representative from Transglobal Door, Inc. (Transglobal), the ultimate purchaser of the imported plywood, dated May 14, 2019.  *Id*.  CBP denied both protests on March 5, 2020.  *Id*.

---

[1] A twelfth entry, Entry No. 949-0008813-2, was severed and dismissed from this action for lack of jurisdiction on June 29, 2021.  *See* Slip Op. 21-80, ECF No. 16.

[2] *See Certain Hardwood Plywood Products from the People's Republic of China: Amended Final Determination of Sales at Less than Fair Value, and Antidumping Duty Order*, 83 Fed. Reg. 504 (January 4, 2018); *Certain Hardwood Plywood Products from the People's Republic of China: Countervailing Duty Order*, 83 Fed. Reg. 513 (January 4, 2018).

In bringing this action to challenge the denied protests, Bral alleges that "{t}he subject plywood in its imported condition was defective in that the melamine coating separated from the plywood after minimal exposure to the elements.  This was a latent defect that was discovered only after Bral had delivered some of the product to Transglobal.  Subsequent testing by Bral confirmed the presence of this defect."  Compl. ¶11.  As a result, Bral claims that "{t}he plywood can only be sold for salvage… at 18% of the original value as based on the lowest wholesale prices of similar non-marine grade plywood products."  *Id.* at ¶¶12-13.  Bral thus contends that "CBP erred by not granting an allowance in value by reducing the appraised value to 18% of the original value of the merchandise and by not assessing *ad valorem* duties and fees on the reappraised value of the merchandise."  *Id.* at ¶22.

As explained below, Bral has not substantiated the claims in its complaint, and consequently, cannot establish that it should be granted an allowance reducing the value of its imported plywood.  We therefore cross-move for summary judgment and oppose Bral's motion for summary judgment.

## PARTIES

Bral is an importer, delivery and warehouse operator, and contract manufacturer of products across various industries, including, but not limited to, railroad, heavy truck, and oil and gas, and is the importer of the merchandise at issue.  *See* Def's Ex. A, Deposition Transcript of Keith Dunbar (KD Depo) at 7-8; Def's Ex. B, Deposition Transcript of Alison Dunbar (AD Depo) at 6; Compl. ¶2.  Transglobal manufacturers roll-up doors for delivery trucks, trailers, vans, and other vehicles, and also manufacturers miscellaneous products for the transportation industry.  *See* KD Depo at 7; AD Depo at 8; Def's Ex. C, Deposition Transcript of Mark Schroeder (MS Depo) at 6.  Bral imports, sources, supplies, and sells Transglobal the component

parts for the products it manufactures, and also provides Transglobal with engineering and technical expertise.  *See* KD Depo at 8-9; AD Depo at 8.

Keith Dunbar, a USCIT Rule 30(b)(6) designated agent and deponent on behalf of Bral, is the founder of Bral and its President, and he is also a Vice-President of Transglobal.  *See* Def's Ex. G, Pl.'s Responses to Def's First Set of Interrogatories (Rog Responses) at No. 1; KD Depo at 6-9.  Alison Dunbar, also a USCIT Rule 30(b)(6) designated agent and deponent in this action, is Vice-President of Bral.  *See* Rog Responses at No. 1; AD Depo at 6-7.  Mark Schroeder, another USCIT Rule 30(b)(6) designated agent and deponent, is the President of Transglobal. *See* Rog Responses at No. 1; MS Depo at 6.  And James Schroeder, a USCIT Rule 30(b)(6) designated agent and deponent in this action, is the CEO of Transglobal.  *See* Rog Responses at No. 1; Def's Ex. D, Deposition Transcript of James Schroeder (JS Depo) at 6-7.  Collectively, the Dunbars and Schroeders own Transglobal, but the Schroeders do not have an ownership stake in Bral.  *See* KD Depo at 8-9; JS Depo at 7.

## IMPORTED MERCHANDISE

Bral describes "{t}he merchandise subject to this action [a]s three-quarter inch thick melamine coated marine grade eucalyptus plywood from China."  Compl. ¶7.  The imported plywood consists of seven-ply eucalyptus, with interior glue applied by pressure and heat between the layers of the plywood, a hardwood face, and melamine (a composite plastic/resin laminate) applied by an exterior glue to the face of the plywood (and perhaps, also to the back). *See* KD Depo at 20; MS Depo at 12.  QF, an abbreviation used by Bral for a factory in Linyi, China that is likely "Linyi-Feixian Plywood Factory," makes the initial plywood, laminates it, puts the hardwood face on, and sands the plywood to the correct dimensions.  *See* KD Depo at 12, 21, 65-67; MS Depo at 15, 145-47.  QF then sends the plywood to an unknown Chinese

subcontractor for laminating and gluing the melamine to the face of the plywood.  *See* KD Depo at 20-21.

Purportedly, an unknown Chinese specialty plywood-maker supplied QF with the exterior glue for the imported plywood's melamine face as a favor to QF, but it is unknown to Bral, Transglobal, or QF the specific glue that was supplied or used for the imported plywood. *See* KD Depo at 15-17, 23; AD Depo at 23, 28; MS Depo at 13; JS Depo at 19, 33-35, 40-41. Yet Bral and Transglobal expected that the exterior glue for the imported plywood would be a waterproof phenolic resin.  *See* KD Depo at 23; MS Depo at 65-66; JS Depo at 13-14, 33-35. However, Bral did not specify to QF that the imported plywood contain phenolic glue (Transglobal believes that such a request was made).  *See* KD Depo at 25; MS Depo at 82-83; JS Depo at 33-35.  Nor did Bral enter into a written contract with QF or the unknown Chinese glue supplier for the specific glue to be used, or memorialize that the specific type of glue was not to be changed during production of the plywood.  *See* KD Depo at 25-26.

The plywood imported by Bral was sold to Transglobal to be manufactured into roll-up doors or panels in the aftermarket, *i.e.*, as replacement doors and panels on older delivery trucks. *See* KD Depo at 18; MS Depo at 17.  The imported plywood was not suitable for use by Transglobal to manufacture OEM (Original Equipment Manufacturer) doors for new trucks.  *See* MS Depo at 38-39; JS Depo at 12-13.  Rather, the OEM doors manufactured by Transglobal are made of a composite steel material or of a higher face-quality transportation grade plywood. *See* MS Depo at 162; JS Depo at 12-13.

The imported plywood consists of three sizes: 1220 mm x 2489 mm x 19 mm (48" x 98" x ¾" in inches) (hereafter, 48" sheets), 388 mm x 2489 mm x 19 mm (15" x 98" x ¾") (hereafter, 15" panels), and 286 mm x 2489 mm x 19 mm (11" x 98" x ¾") (hereafter 11"

panels).  *See* Protests and Entries; MS Depo at 44-45.  48" sheets are the standard plywood size

for the roll-up door industry, and 11" and 15" panels are used for panel replacements or can be

combined to make a full door; it was cheaper for Transglobal to have QF pre-cut the 11" and 15"

panels than for Transglobal do so after import.  *See* MS Depo at 44-45, 161, 165.  For reasons

unknown to both Bral and Transglobal, the imported plywood is described on the commercial

invoices as "fancy plywood," a designation not used in the plywood industry.  *See* Protests and

Entries; KD Depo at 34-35; MS Depo at 80-81.

Development of the Chinese-made plywood began approximately in 2015 for cost

savings reasons, as a cheaper replacement for the domestic plywood Transglobal had used to

manufacture replacement doors and panels.  *See* KD Depo at 18-19; MS Depo at 41.  Indeed, the

imported plywood was 25 percent less expensive (or cheaper by $12 a sheet) than the plywood

sourced domestically.  *See* KD Depo at 45; MS Depo at 42.  In contrast to the imported plywood,

the domestic plywood that Transglobal used to manufacture replacement doors and panels is

seven-ply ¾" marine-grade Douglas Fir plywood with a painted hardwood face and no

melamine, and very rarely had delamination issues.  *See* MS Depo at 10-11, 30-32.  During the

development phase of the Chinese plywood, a variety of plywood samples consisting of various

components and woods, including eucalyptus, poplar, birch, and pine, were manufactured by QF

and imported by Bral to be tested.  *See* KD Depo at 22-23, 46-47; MS Depo at 65-67, 124-27; JS

Depo at 12-13.  These tests involved subjecting the plywood samples to hundreds of hours in a

salt-spray cabinet, hanging the samples outside for months, and manufacturing the plywood

samples into roll-up doors and installing them in local trucks to see how they performed—but the

identity or nature of the specific glue was not specifically tested.  *See* KD Depo at 26, 33; MS

Depo at 17-18, 101-02, 117, 127-28; JS Depo at 25-26, 28-29.

By the end of 2016, Transglobal and Bral had a plywood product ready to import from QF, although Keith Dunbar does not recall what type of wood was settled-on for the imported plywood, and why such wood was used.  *See* KD Depo at 22-23, 46; MS Depo at 129.  His lack of recall may be the result of Bral and Transglobal continuing to import and test samples of Chinese-made plywood of various components (*i.e.*, woods, glues, faces, etc.) *after* Bral began importing the eucalyptus-based products at issue in this litigation in order to import the cheapest plywood product possible.  *See* MS Depo at 132-34; Def's Ex. E, Pl's Documents Produced (Pl. Docs) at Bates 0028, 0091.  The imported plywood at issue in this case consists of eucalyptus, a high water-absorption wood that QF must first dry to lower its moisture content, does not perform as well as the domestically-sourced Douglas Fir wood, and "is a very difficult wood to [get] good glue adhesion."  *See* MS Depo at 103-04, 108-09; Pl. Docs at Bates 0135, 0162-63, 0183.

Once the containers of imported plywood arrive in Cleveland, Bral neither opens nor inspects the containers; instead, Bral forwards the containers directly to Transglobal.  *See* AD Depo at 18.  When Transglobal receives the imported plywood, it inspects the plywood for the correct thickness, cuts it to size, and manufactures the plywood into a replacement panel or door.  *See* MS Depo at 24.  Upon receipt of the imported plywood, Transglobal does not test samples of the imported plywood from the entries at issue in the salt-spray cabinet, nor does it test the glue from the imported plywood.  *See* MS Depo at 76-77, 80, 117; JS Depo at 29.

When manufacturing doors, Transglobal drills the laminate face of the plywood and rivets the door's hardware.  *See* MS Depo at 33-35.  After Transglobal manufacturers a door, the door is measured and inspected for surface defects, boxed, and shipped out to the customer within five days of being made.  *See* MS Depo at 46.  The customers then install the doors or

panels themselves when an existing door or panel needs replacing.  *See* MS Depo at 38-39, 71-72, 75.  Transglobal offers a one-year warranty for any delamination issues on its replacement doors and panels made with the imported plywood, running from the date of installation.  *See* MS Depo at 37, 87-88.

Transglobal did not sell replacement doors or panels made with plywood imported from China until January 2017.  *See* MS Depo at 17.  According to Transglobal, problems with the plywood imported from China began with shipments it received in May or July 2017; this plywood would have been made-up into doors or panels and sold two to six months later, with Transglobal's customers purchasing the doors in October or November 2017 and complaining in Spring 2018 that the melamine faces were falling off the doors.  *See* MS Depo at 19-21, 58, 61, 73; JS Depo at 20.  Notably, these shipments of problematic plywood pre-date the entries of imported plywood at issue, the first shipment of which was received by Transglobal on August 21, 2017.  *See* Protests and Entries; Pl's Ex. Q, Item Stock Inquiry Reports (ISIR).  Further, Transglobal received warranty claims for delaminated doors and panels as early as May 2017— again, months before any of the imported plywood in the entries at issue was received by Transglobal.  *See* Def's Ex. H, Warranty Claims For Delaminated Wood (Warranty Claims). Regardless of these discrepancies, Transglobal represents that it was unaware of any issues with the imported plywood used in its manufactured doors and panels until approximately March or April 2018.  *See* MS Depo at 21, 61; JS Depo at 20.  That said, Transglobal continued to manufacture and sell replacement doors and panels from the imported plywood until July, August, or October 2018, and may have done so as late as January 2019.  *See* MS Depo at 64; JS Depo at 29-31; ISIR.

Bral and Transglobal posit that the claimed delamination issues—in which the melamine faces on installed replacement doors and panels made from the imported plywood came apart after being subject to moisture and freeze throughout the winter and then thaw and drying out in the spring sun—was caused by the unknown Chinese glue supplier switching the plywood's exterior glue (of unknown type) to a lower quality glue (also unknown).[3]  *See* KD Depo at 25, 29-30, 42; MS Depo at 67, 78, 117; JS Depo at 20, 28-29, 40-41.  Both Bral and Transglobal suspect that QF changed the glue on its own accord, likely to meet the low-costs that plaintiff sought for the imported plywood, while pointing the finger at the unknown glue supplier.  *See* AD Depo at 27; MS Depo at 65, 117-18, 145-48; JS Depo at 40-41.  An undated "Letter of Statement" from Linyi Feixian Plywood Factory (again, which is likely QF) to Transglobal states that the "plywood delamination issue since the last two years" was purportedly a result of the "glue supplier lowed [sic] the glue quality due to cost increasing issue."  *See* Pl. Ex. L, Pl. Docs at Bates 0067.  Yet Bral and Transglobal do not know when this letter was created and received, and what specific two-year period is being referred to in the letter.  *See* KD Depo at 65-67; MS Depo at 145-47.  It is also unknown if QF switched glue suppliers during the two-year period, authorized the glue change to the plywood, was itself aware of the glue change at the time it was changed, or even why the glue change caused the delamination issues.  *See* KD Depo at 27, 65-67.

After the last entry at issue in this litigation was received by Transglobal in June 2018, Bral ceased to import plywood from China; now Bral and Transglobal once again source all

---

[3] At the end of 2017, there was a preceding, periodic, and seemingly-separate glue issue with imports of plywood from China, in which an insufficient amount of glue was applied to the face of the plywood, which caused the melamine to separate from the portion of the plywood where not enough glue was applied.  *See* MS Depo at 135-39; JS Depo at 22-24.  QF replaced these defective plywood sheets at Transglobal's request if insufficient glue was spotted before the plywood was manufactured into doors.  *Id*.

plywood domestically.  *See* KD Depo at 29; ISIR; Protests and Entries.  Although QF indicated that it could replace the plywood—and it is customary in the industry for manufacturers to replace delaminated plywood—neither Bral nor Transglobal requested it to do so.  *See* AD Depo at 27; JS Depo at 21-22, 24, 32; Pl. Docs at Bates 0050-51.  Instead, Bral asked QF to reimburse it for the cost of the plywood, but Bral and Transglobal did not recover their costs from QF or the glue supplier.  *See* KD Depo at 31-32, 67; AD Depo at 28-29; MS Depo at 70, 148; JS Depo at 21-22.  Bral and Transglobal decided not to sue either entity as they believed they would be unable to recover from Chinese companies.  *Id*.

The imported plywood was not insured.  *See* MS Depo at 70.  Nor did Transglobal make a claim to its product liability insurer for any defective doors that it manufactured with the imported plywood as it was unclear to Transglobal whether such a claim would be covered and its impact on Transglobal's premiums.  *See* MS Depo at 90.

## QUESTION PRESENTED

Whether plaintiff has established that it is entitled to an allowance in the appraised value of the imported plywood.

## SUMMARY OF ARGUMENT

CBP correctly appraised the imported plywood without an allowance reducing its value. To prevail on a 19 C.F.R. § 158.12(a) claim for an allowance in value on account of partially damaged merchandise at the time of importation, Bral must demonstrate that: (1) it contracted for defect-free plywood; (2) any latent defects in the plywood existed at the time of importation, which Bral then must link to specific entries; and (3) Bral must also establish the value amount of the allowance for each entry.  Bral is unable to satisfy any of these requirements, let alone all of them, which is required for the grant of a Section 158.12(a) claim.

Bral cannot demonstrate that it contracted with the plywood manufacturer for defect-free merchandise, as it has not provided any contracts, specifications, purchase orders, or other documents that establish the specific qualities, quantities, and components of the imported plywood.  Bral is also unable to demonstrate what portion, if any, of the imported plywood is defective, that any claimed defects existed at the time of importation, and then link any known defective plywood to specific entries.  Instead, Transglobal's warranty and inventory records reveal that very little, if any, of the imported plywood resulted in complaints of delaminated doors and panels.  Finally, Bral has not provided any documentation or other specific evidence to support its claim that all of the imported plywood should be reappraised at 18 percent of the value that it was appraised upon liquidation.

Accordingly, our cross-motion for summary judgment should be granted, plaintiff's motion for summary judgment should be denied, and this action should be dismissed.

## ARGUMENT

### I.   STANDARD OF REVIEW

Under USCIT Rule 56, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  USCIT Rule 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  On a motion for summary judgment, the Court determines whether there are any factual disputes that are material to the resolution of the action.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Texas Apparel Co. v. United States*, 698 F. Supp. 932, 934 (Ct. Int'l Tr. 1988), *aff'd*, 883 F.2d 66 (Fed. Cir. 1989), *cert. denied*, 493 U.S. 1024 (1990) (citations omitted).  "The court may not resolve or try factual issues on a motion for summary judgment."

*Phone-Mate, Inc. v. United States*, 690 F. Supp. 1048, 1050 (Ct. Int'l Tr. 1988), *aff'd*, 867 F.2d

1404 (Fed. Cir. 1989) (citation omitted).  In determining whether a genuine issue of fact exists,

the Court reviews the evidence submitted, drawing all inferences against the moving party.  *See*

*United States v. Pan Pac. Textile Group Inc.*, 276 F. Supp. 2d 1316, 1319 (Ct. Int'l Tr. 2003);

*Matsushita Elecs. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Here, there are

no material facts in dispute to preclude summary judgment in favor of the Government.

## II.    BRAL'S IMPORTED PLYWOOD IS NOT ENTITLED TO AN ALLOWANCE REDUCING ITS VALUE

CBP liquidated Bral's imported plywood based on the "transaction value" method of

appraisement under 19 U.S.C. §§ 1401a(a)(1)(A) and 1401a(b), which is "the price actually paid

or payable for the merchandise when sold for exportation to the United States."  19 U.S.C. §

1401a(b)(1).  The parties do not dispute that the imported plywood should be appraised under

transaction value.  *See* ECF No. 27-1, Pl. Memo at 4.  However, Bral claims that its imported

plywood "was partially damaged at the time of importation," which pursuant to 19 C.F.R. §

158.12(a), Bral contends qualifies it for an allowance reducing the value of the plywood by 82

percent.

Section 158.12(a) provides, in relevant part, as follows:

> Allowance in value. Merchandise which is subject to ad valorem or
> compound duties and found by the port director to be partially
> damaged at the time of importation shall be appraised in its
> condition as imported, with an allowance made in the value to the
> extent of the damage…

The Court of Appeals for the Federal Circuit has held that "a latent manufacturing or

design defect constitutes 'damage' for purposes of the regulation" because Section 158.12(a)

"applies when the merchandise received is worth less than the merchandise that was ordered."

*Volkswagen of Am., Inc. v. United States*, 540 F.3d 1324, 1331 (Fed. Cir. 2008) (internal

citations omitted). The Federal Circuit has also held that "§ 158.12, by its terms, permits allowances for goods partially damaged when imported, whenever that damage is discovered." *Saab Cars USA, Inc. v. United States*, 434 F.3d 1359, 1362 (Fed. Cir. 2006) (internal quotation marks and citation omitted).

The Federal Circuit's *Samsung* line of cases, as reiterated under *Saab*, involving a claim for defective electronic merchandise, set forth the following three requirements that an importer must establish to successfully claim an allowance under Section 158.12(a): "(1) show that it contracted for 'defect-free' merchandise; (2) link the defective merchandise to specific entries; and (3) prove the amount of the allowance for each entry." *Saab*, 434 F.3d at 1363-64 (citing *Samsung Elecs. Am. v. United States*, 106 F.3d 376, 379-80 (Fed. Cir. 1997) (*Samsung I*) and *Samsung Elecs. Am. v. United States*, 195 F.3d 1367, 1368-69 (Fed. Cir. 1999) (*Samsung II*)). The importer's allowance claim is to be made by a preponderance of evidence. *Fabil Mfg. Co. v. United States*, 237 F.3d 1335, 1339 (Fed. Cir. 2001).

For the reasons set forth below, Bral is unable to satisfy each of the Federal Circuit's three-prongs for an allowance under Section 158.12(a). As a consequence, Bral's claim to reappraise the imported plywood at 18 percent of its appraised value upon liquidation must be denied.

### A.    Bral Has Not Shown That It Contracted For Defect-Free Merchandise

The first Federal Circuit prong requires that Bral establish that it contracted "for 'defect-free' merchandise." *Saab*, 434 F.3d at 1363-64. To ascertain whether an importer has contracted for "defect-free" merchandise, "the intent of the parties, for instance as evidenced by the written instruments forming the contract, is of primary concern." *Samsung I*, 106 F.3d at 379 (explaining that although the sales contracts between Samsung and its parent manufacturer

contemplated "manufacturing defects," this "does not mean that Samsung 'ordered' defective merchandise or both defect-free and defective merchandise" because it made "no commercial sense for Samsung to purposefully deal in defective goods"). In *Fabil*, the importer ordered "machine washable" jackets bearing the "Coca-Cola" logo; however, the jackets did not conform to what was ordered, but rather had a latent defect as the logos disintegrated and the colors ran when the jackets were machine washed, rendering them unusable. *Fabil*, 237 F.3d at 1339.

Here, Bral claims that "{t}he purchase orders issued by Bral to the plywood manufacturer specified that the plywood and the melamine coating must withstand exposure to salt spray, rain and ultra-violet light." Compl. ¶10. These claims do not hold up to scrutiny. Bral has not produced any purchase orders, sales contracts (or contracts of any kind), or any other specifications for the imported plywood or its constituent components detailing how the imported plywood must perform. Indeed, there are no purchase orders for the imported plywood. *See* AD Depo at 25-26; MS Depo at 157; Def's Ex. I, Post-Deposition Request Responses from Plaintiff's Counsel (Post-Depo Responses). Instead, Bral purportedly used emails between Keith Dunbar and Charles Wu (a contract employee of Bral and Transglobal based in China) to order and schedule shipments of plywood from China; and only Messrs. Dunbar and Wu communicated with QF regarding the imported plywood. *See* AD Depo at 25-26; MS Depo at 7; JS Depo at 34-35. However, Bral has not produced any documents, emails or other communications directed to QF for the specific quantity and sizes of imported "fancy plywood" listed on the invoices in the entries at issue; nor has it produced any documents, emails or other communications that clearly describe and detail the components and requirements of the "fancy plywood" that QF manufactured and Bral imported. *See* Post-Depo Responses.

14

Instead, Bral has merely produced initial and revised commercial invoices, ostensibly from Ningbo Metal International Trading Co., Ltd. (Ningbo), a Chinese trading company authorized to export the "fancy plywood."  *See* AD Depo at 13; Protests and Entries.  But these invoices were created by Bral, not Ningbo.  *See* MS Depo at 57.  Further, Ningbo is not the imported plywood manufacturer; nor did Bral issue purchase orders to Ningbo.  *See* Def's Ex. F, Pl.'s Responses to Def's 1ˢᵗ Request for Production and Things (RFP Responses) No. 3.  There is also a question whether the information contained on the invoices is accurate.  *See* MS Depo at 56-57 (discussing whether the "Shipment Date" listed on the invoices is actually the invoice date).  In short, the commercial invoices list the quantity, sizes, and prices of the plywood that Bral entered, but reveal nothing about the componentry, requirements, and performance of the imported "fancy plywood."

Nor are there specifications, schematics, diagrams, process memoranda, bills of materials, or the like for the imported "fancy plywood" and that it "must withstand exposure to salt spray, rain and ultra-violet light."  *See* MS Depo at 83, 158; KD Depo at 68; Compl. ¶10. Indeed, with respect to one of the defects claimed by Bral, there was no specification.  In response to an inquiry from Charles Wu ("The factory would like to know the salt spray requirement, and the standard.") for the plywood being developed in China, Keith Dunbar responded, in part, as follows: "We do not have a specific requirement."  Pl. Docs at Bates 0122.

Notwithstanding the absence of product specifications, Bral contends that "{t}he specifications of the imported merchandise were developed over a period of years during which time Plaintiff and Transglobal Door received product samples for testing and performance." RFP Responses No. 2.  And that "{w}hen the roll-up doors performed well in these tests, Bral and Transglobal ordered larger quantities of the product for use in production.  The obvious

expectation was that the manufacturer would produce plywood to the same standard as for the previous shipments."  Pl. Memo at 6 (citations omitted).

Despite these assertions, the record before the Court is devoid of documentation that Bral or Transglobal memorialized "specifications of the imported merchandise," that Bral specifically contracted with QF for the imported plywood to comply with such "specifications," or that the imported plywood be composed of certain materials and certain materials only that perform in a desired manner.  Without any clear specifications or contracts, Bral cannot show that it contracted for defect-free merchandise, or that it even contracted for a specific agreed-upon plywood product at all.  The imprecise and fungible nature of the plywood manufactured by QF is further evidenced by Bral continuing to import and test various plywood samples of different components with the aim of sourcing the cheapest plywood product possible, even though it had already began making entries of the imported plywood at issue.  *See* MS Depo at 132-34; Pl. Docs at Bates 0028, 0091.

Ultimately, Bral may have desired "a high-quality product at an acceptable price," Pl. Memo at 5, as plaintiff contends, but it did not specifically contract for, or even purchase, one. Instead, Bral imported a plywood product of unknown quality from an overseas manufacturer that it—or its unknown suppliers—likely cut corners on the components in order to deliver a low-cost product to Bral and Transglobal.  But rather than request that QF replace any of the uninsured imported plywood, sue QF or the unknown glue supplier to recover any of its costs, or file a product liability claim for any doors or panels under warranty, plaintiff attempts to have the Government underwrite and absolve Bral and Transglobal of the inherent business risk that they assumed when importing a low-cost product from an unreliable manufacturer.  *See* AD Depo at

27-29; KD Depo at 31-32, 67; MS Depo at 70, 90, 148; JS Depo at 21-22; Pl. Docs at Bates

0050-51.  This attempt must be rejected.

> **B.      Bral Cannot Show That The Imported Plywood Was Defective At The Time Of Importation And Link Any Purported Defects To Specific Entries**

In addition to showing that it contracted for defect-free merchandise, to prevail on its

claim for an allowance, Bral must also establish that any latent defects in the imported plywood

existed at the time of importation and, under the Federal Circuit's second prong for an allowance

claim, link any defective plywood to specific entries.  *See* 19 C.F.R. § 158.12(a); *Saab*, 434 F.3d

at 1363-64.  The Federal Circuit has held that where a long period of time has elapsed between

importation and the discovery of a defect, the importer must establish that intervening factors or

normal usage did not cause the defect.  *See Saab*, 434 F.3d at 1362, 1374 (affirming that (1) this

Court lacked jurisdiction for auto repairs made after the protest date; (2) the importer was

entitled to an allowance of its defect claims for repairs made at the port; and (3) the importer

failed to establish that post-importation warranty repairs were for defects present at importation).

In *Volkswagen*, a companion car warranty repair case in which the court applied *Saab*,

the Federal Circuit explained that

> {a}lthough it is possible that the windshield washer container was
> leaking at the time it was imported, it is equally possible that the
> container was damaged in transit from the point of entry or while
> in the dealer's lot.  Without more, we cannot conclude from the
> mere fact that Volkswagen made a determination that the repair
> was covered under its warranty that the alleged defect existed at
> importation.  Indeed, Volkswagen presented no evidence that it
> determines (or how it determines) whether a particular vehicle
> presented for repair has a defect that existed at the time of
> importation.

*Volkswagen*, 540 F.3d at 1334.  In *Samsung II*, the Federal Circuit rejected conclusory affidavits

that attempt to meet this burden, and held that "[a]ppraisal…must be done on an entry-by-entry

basis" because "Customs is not allowed to assign one entry the values of merchandise in other entries or the duties owing them." *Samsung II*, 195 F.3d at 1370-72 (emphasis and internal quotations omitted). The Federal Circuit also clarified that where all the imported merchandise was alleged to be defective at a total loss, the importer was not required to make an entry-by-entry showing of damage. *Fabil*, 237 F.3d at 1339.

Bral cannot establish that each entry of imported plywood was defective at the time of importation. Yet Bral summarily concludes that "{i}t is also clear that all the plywood imported after May 2017 was defective." Pl. Memo at 6. The record before the Court undermines that conclusion. By way of illustration, the table below, which we created for the Court's convenience from Transglobal's Item Stock Inquiry Reports and the entries at issue, lists in chronological order all known shipments of plywood manufactured in China, imported by Bral, and received by Transglobal. The table includes the shipments from the entries at issue here, as well as those that are not before the Court, the quantity and size of the plywood received, and the amount of plywood used by Transglobal to manufacture replacement doors or panels:

| Entry Number | Import Date | Date Received By Transglobal | Quantity of Plywood Received | Amount of Plywood Used To Make Doors/Panels |
|---|---|---|---|---|
| Unknown | Unknown | 07/25/2016 | 48 x 98: 360<br><br>15 x 98: 720 | Presumably All[4] |
| Unknown | Unknown | 11/15/2016 | 48 x 98: 247 | Presumably All |

---

[4] Every "Presumably All" shipment was likely manufactured by Transglobal into replacement doors or panels based upon Transglobal's first in/first out practice of using all of the plywood from an earlier shipment to manufacture doors and panels before using plywood from subsequent shipments. *See* MS Depo at 53-54. Since Transglobal used all of the imported plywood to manufacture doors and panels from multiple shipments following the last in time "Presumably All" shipment, it can be assumed that all of the plywood from each "Presumably All" shipment was likewise used to manufacture doors and panels.

18

| Unknown | Unknown | 05/03/2017 | 48 x 98: 1200 | Presumably All |
|---|---|---|---|---|
| Unknown | Unknown | 06/26/2017 | 48 x 98: 720<br><br>15 x 98: 1440 | Presumably All |
| Unknown | Unknown | 08/07/2017 | 48 x 98: 720<br><br>15 x 98: 1440 | Presumably All |
| EE903001430 | 08/01/2017 | 08/21/2017 | 48 x 98: 697<br><br>15 x 98: 1426 | All |
| Unknown | Unknown | 08/31/2017 | 48 x 98: 1103<br><br>15 x 98: 2174 | Presumably All |
| Unknown | Unknown | 09/20/2017 | 48 x 98: 1080<br><br>15 x 98: 2160 | Presumably All |
| EE903022972 | 11/09/2017 | 12/01/2017 | 48 x 98: 720<br><br>15 x 98: 1446 | All |
| EE903026668 | 11/19/2017 | 12/29/2017 | 48 x 98: 720<br><br>15 x 98: 1446 | All |
| EE903029357 | 12/03/2017 | 12/07/2017 | 48 x 98: 712<br><br>15 x 98: 1434 | All |
| 94900087225 | 01/10/2018 | 01/22/2018 | 48 x 98: 712<br><br>15 x 98: 1434 | All |
| 94900088132 | 01/17/2018 | 02/01/2018 | 48 x 98: 368<br><br>15 x 98: 2157<br><br>11 x 98: 560 | All |

| 94900089270 | 01/17/2018 | 02/01/2018 | 48 x 98: 720<br>15 x 98: 4317<br>11 x 98: 1120 | 48" Sheets: All<br>15" Panels: 995.44<br>11" Panels: 120.30 |
|---|---|---|---|---|
| EE903041212 | 02/01/2018 | 02/15/2018 | 48 x 98: 360<br>15 x 98: 2163<br>11 x 98: 560 | 48" Sheets: All<br>11" & 15" Panels: None |
| EE903042897 | 02/11/2018 | 02/22/2018 | 48 x 98: 360<br>15 x 98: 2169<br>11 x 98: 560 | 48" Sheets: All<br>11" & 15" Panels: None |
| EE903044927 | 02/19/2018 | 03/06/2018 | 48 x 98: 719<br>15 x 98: 4320<br>11 x 98: 1120 | 48" Sheets: 531.86<br>11" & 15" Panels: None |
| EE903047474 | 03/02/2018 | 03/20/2018 | 48 x 98: 1081<br>15 x 98: 5046<br>11 x 98: 1120 | None |
| EE903068496 | 06/01/2018 | 06/25/2018 | 48 x 98: 720<br>15 x 98: 2880<br>11 x 98: 576 | None |

*See* Protests and Entries; ISIR.

As reflected in the above table, Bral imported five shipments of plywood from China before the first entry at issue in this litigation was made, and two shipments of plywood from China were received by Transglobal *after* the first entry at issue was made. These shipments raise multiple questions. For instance, if Bral is correct that "all the plywood imported after May

2017 was defective" (*i.e.,* all shipments in the above table but for the first two), then why did Bral not make a Section 158.12(a) allowance claim for the shipments that Transglobal received on 05/03/2017, 06/26/2017, 08/07/2017 (pre-litigation shipments), and on 08/31/2017 and 09/20/2017 (mid-litigation shipments)? And if the plywood in the pre- and mid-litigation shipments was also defective, as Bral seemingly contends, was the plywood defective in the same manner as claimed in this litigation (*i.e.*, delaminated melamine faces), or was it defective for other reasons? Notwithstanding these unanswered questions, Bral has not demonstrated that all (let alone any) of the imported plywood in the entries at issue was defective at the time of importation, or even, at any point.

First, if all of the plywood imported after May 2017 was defective, then Transglobal would have invariably received far more warranty claims from its customers for delaminated doors and panels than it did. But the warranty claim information that plaintiff provided indicates that between May 9, 2017 and February 3, 2021, Transglobal received warranty claims for only 161 delaminated doors and 171 delaminated panels (332 in total). *See* Warranty Claims. The warranty information further indicates that, in total, 1298 11" and 15" panels and 432 and two-thirds (432.67) 48" sheets were used in the manufacture of the delaminated doors and panels subject to the warranty claims. *Id*. Significantly, more 48" sheets (697) and 15" panels (1426) were imported under cover of the earliest entry at issue in this litigation, EE903001430, than the *total* number of plywood panels and sheets used in the manufacture of *all* warrantied delaminated doors and panels over a nearly four-year period. *See id*.; Protests and Entries; ISIR. Bral's claim, therefore, that all of the plywood imported after May 2017 was defective is belied by the simple fact that more plywood was received and made into doors and panels from just one

entry at issue than was used to manufacture all of the doors and panels subject to delamination warranty claims for nearly four years.

Further, not all of the 332 total delamination warranty claims are readily attributable to the imported plywood, as a handful of the warranty claims pre-date the entries at issue, and a number of the delaminated doors and panels could not conceivably have been manufactured with plywood from the entries at issue given the lag-time that it takes Transglobal to manufacture the doors and panels, for its customers to then install the doors and panels in a truck, and for the suspected winter freeze/spring thaw to result in any potential delamination issues. *See* Warranty Claims; MS Depo at 19-21, 58, 78; JS Depo at 20, 28-29; Protests and Entries; ISIR. Moreover, because Transglobal ceased to manufacture and sell doors and panels from the imported plywood at some point between mid-2018 and early 2019, a number of the delaminated warranty claims likely exceed the one-year period that Transglobal provides for its aftermarket doors and panels, and thus, likely cannot be attributed to the imported plywood. *See* MS Depo at 37, 87-88.

Ultimately, Transglobal's records indicate that of the 7,889 48" sheets, 30,238 15" panels, and 5,616 11" panels received from the twelve entries at issue, in total, 5,900.86 48" sheets, 10,334.44 15" panels, and 680.30 11" panels were used to manufacture doors and panels—the vast bulk of which were neither the subject of delamination warranty claims nor clearly attributable to such claims, and as such, are presumably not defective in any respect. *See* ISIR. Furthermore, these totals do not include the plywood sheets and panels from the pre-litigation and mid-litigation shipments *not at issue* in this litigation, but were received by Transglobal beginning in May 2017 and continuing through September 2017. This non-litigation plywood consisted of 4,823 48" sheets and 7,214 15" panels, all of which was presumably used to manufacture replacement doors and panels. *See* table *supra*; ISIR. Given that Bral has not

produced documentation tying a particular manufactured door or panel—whether the door or panel had delaminated or not—to a specific shipment of imported plywood (nor is it clear whether plaintiff is able to do so, *see* MS Depo at 47-48), it is significantly more likely than not that all or nearly all of a given shipment of imported plywood was not defective. It is also entirely plausible that all of the plywood sheets and panels used in the manufacture of the warrantied delaminated panels and doors was from shipments not at issue in this litigation.

Thus, setting aside the separate but sizable issues of (1) Bral's inability to demonstrate that any purported latent delamination issues in the imported plywood existed at the time of importation; (2) that any known delaminated doors and panels were indeed caused by an unknown low-quality exterior glue, as opposed to any other intervening factors or normal usage, or even from the overall poor quality of the imported plywood and its components; and (3) whether Bral and Transglobal should have exerted better testing protocols and quality control over the imported plywood before it was manufactured into doors and panels—Bral is unable to establish what portion, if any, of the imported plywood is defective, and then link any known defective plywood to specific entries. As a result, Bral cannot satisfy the Federal Circuit's second prong of a valid allowance claim, and consequently, its allowance claim must be rejected.

### C.     Bral Cannot Establish That Its Imported Plywood Should Be Reduced To 18 Percent Of Its Liquidated Value

Section 158.12(a) provides, in part, that "an allowance [is] made in the value to the extent of the damage." 19 C.F.R. § 158.12(a). The Federal Circuit's third prong for a valid allowance claim thus requires that Bral establish "the value of the defects of a given entry." *Samsung II*, 195 F.3d at 1371. Assuming that Bral is able to satisfy the Federal Circuit's first two prongs for an allowance, which it cannot, the Federal Circuit has generally ruled that evidence of the valuation of partial damage must be specific and not vague. For example, in *Samsung II*, the

Federal Circuit held that "annual cost accounting, is not applicable to this regulation and more specific proof is necessary," and affirmed this Court's decision that "without some more concrete temporal connection between the subject entries, and the submitted warranty costs, only vague assumptions can be made about the appropriate allowance for the defects in subject entries." 195 F.3d at 1372 (internal citation omitted).

Bral claims that the appraised value of the imported plywood should be reduced to 18 percent of the original value of the plywood. Compl. ¶22. Bral's claimed 18 percent salvage value number was determined by Mark Schroeder, President of Transglobal, as the lowest wholesale amount that it would cost Transglobal to purchase non-marine grade lumber from its local supplier for making crates and skids. *See* AD Depo at 11, 29-30; MS Depo at 158-60; Compl. ¶13. However, Mr. Schroeder explained that currently the wholesale or retail salvage value of the unused imported plywood would likely be 25-40 percent of the original invoiced value of the plywood, and not 18 percent. *See* MS Depo at 166-67. In any event, according to Mr. Schroeder, the unused imported plywood in Transglobal's stock cannot be fixed for future use in the manufacture of doors and panels. *See* MS Depo at 84-85. Further, at the direction of plaintiff's counsel, on account of this litigation, neither Bral nor Transglobal has attempted to resell any of the unused imported plywood. *See* AD Depo at 26-27; MS Depo at 86-87, 158-60.

Apart from Mr. Schroeder's representations, "{t}here are no documents, including proofs of sale, to substantiate the 18% salvage value." RFP Responses at No. 11; *see also* RFP Responses at No. 18. Rather, the 18 percent alleged salvage value figure is solely the result of Mr. Schroeder's phone calls with Transglobal's local lumberyard. *See* MS Depo at 167-69; AD Depo at 30-33. We submit that, without more, these phone calls and representations are not

specific proof of Bral's claimed salvage value amount, and therefore, fail to establish that the purported latent defect devalued the imported plywood by 82 percent.

Moreover, Bral's salvage value claim is for all of the imported plywood.  *See* Pl. Memo at 6 ("Bral is entitled to an allowance for all the merchandise imported on each entry.").  But as explained in the preceding section, *supra* B, Bral has failed to establish which portion of the imported plywood, if any, is actually defective given the relatively few number of warranty claims for delaminated doors and panels when compared to the total amount of imported plywood manufactured into doors and panels.  A significant portion of the imported plywood was manufactured into doors and panels without documented complaint, and therefore cannot be the subject of a valid claim for an allowance, as such doors and panels are not defective.  Thus, even if Bral were able to satisfy all three prongs of the Federal Circuit's test for an allowance reducing the value of its imported plywood, the allowance should be strictly limited to only the portion (whatever that may be) of the imported plywood that has been proven defective.

## **CONCLUSION**

For these reasons, we respectfully request that the Court grant our cross-motion for summary judgment, deny plaintiff's motion for summary judgment, enter judgment in our favor and dismiss this action.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

By:    JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

25

<u>/s/ Aimee Lee</u>
AIMEE LEE
Assistant Director

Of Counsel:

<u>/s/ Alexander Vanderweide</u>

Sabahat Chaudhary                          ALEXANDER VANDERWEIDE
Office of the Assistant Chief Counsel       Senior Trial Counsel
International Trade Litigation               Civil Division, U.S. Dept. of Justice
U.S. Customs and Border Protection          Commercial Litigation Branch
                                            26 Federal Plaza
                                            New York, New York 10278
                                            Tel. (212) 264-9230 or 0482
                                            Attorneys for Defendant

Dated: July 18, 2022

26

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: HON. JENNIFER CHOE-GROVES, JUDGE

| | | |
|---|---|---|
| _____ : | | |
| BRAL CORPORATION, | : | |
| | : | |
| Plaintiff, | : | Court No.  20-00154 |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant. | : | |
| _____ : | | |

## **CERTIFICATE OF COMPLIANCE**

I, ALEXANDER VANDERWEIDE, a senior trial counsel in the Office of the Assistant
Attorney General, Civil Division, Commercial Litigation Branch, International Trade Field
Office, who is responsible for the Government's July 18, 2022 cross-motion for summary
judgment and response in opposition to plaintiff's motion for summary judgment, relying upon
the word count feature of the word processing program used to prepare the brief, certifies that
this cross-motion and response complies with the word count limitation under the Court's
chambers procedures, and contains 11,619 words.

<u>/s/ Alexander Vanderweide</u>